GURBIR S. GREWAL
Attorney General of New Jersey
Richard J. Hughes Justice Complex
25 Market Street
P.O. Box 106
Trenton, New Jersey 08625-0106

By: Valerie A. Hamilton (018201995)
    Deputy Attorney General
    (609) 376-3256
    Valerie.Hamilton@law.njoag.gov
    Attorney for New Jersey
    Division of Taxation

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | ) Hon. Michael B. Kaplan |
| | ) |
| | ) Case No. 17-20755 (MBK) |
| ALEXANDER FIGLIOLIA, | ) |
| | ) Chapter 11 |
| | ) |
| Debtor. | ) Hearing Date: |
| | ) February 11, 2019 at 10:00 a.m. |

**OBJECTION BY THE NEW JERSEY DIVISION OF TAXATION TO
CONFIRMATION OF DEBTOR'S SECOND MODIFIED PLAN OF LIQUIDATION**

The State of New Jersey Division of Taxation ("N.J. Taxation") hereby objects to confirmation of the Debtor's Second Modified Plan of Liquidation ("Plan") [Docket No. 111], and in support thereof, states and represents as follows:

**INTRODUCTION**

1. Confirmation of the Debtor's Plan should be denied because the Plan fails to provide adequate treatment of the N.J. Taxation's priority claims, as required by 11 U.S.C. § 1129(a)(9)(C). Specifically, the Plan fails to provide for payment of N.J.

Taxation's priority claims within five (5) years of the date the order for relief was entered, fails to pay interest on N.J. Taxation's priority claim at the required statutory rate, and pays general unsecured claims before N.J. Taxation's priority claims are paid in full.

2. The Court should also deny confirmation of the Debtor's Plan because the Plan improperly classifies the N.J. Taxation's secured claim as an unsecured claim, in violation of 11 U.S.C. § 1122(a).

3. The Plan fails to provide for satisfaction of N.J. Taxation's statutory lien upon the sale of the Debtor's residence. Instead, the Plan provides for payment of the junior liens held by the Internal Revenue Service ("IRS") despite those liens having been perfected after N.J. Taxation's liens.

4. The Plan provides for the sale of the Debtor's residence, which the Debtor maintains will yield proceeds sufficient to satisfy all secured claims in full and make partial or full distributions to priority and unsecured creditors. If the Debtor correctly asserts that there is equity in the residence after payment of the mortgages, then N.J. Taxation's claim is secured by that equity, and N.J. Taxation is entitled to receive treatment of the claim as such. All proceeds of sale of the Debtor's residence after satisfaction of the mortgage liens should be paid to N.J. Taxation.

**BACKGROUND**

5. On May 25, 2017 (the "Petition Date"), the Debtor filed a voluntary bankruptcy petition under Chapter 11 of the Bankruptcy Code.

6. On August 31, 2018, the IRS filed a proof of claim ("Claim 6-3" or the "IRS's POC"), asserting a secured claim in the amount of $10,900.00 and a general unsecured claim in the amount of $3,949,946.60. The IRS asserts that it perfected its lien by recording a Notice of Lien in the Monmouth County land records on November 22, 2016.

7. On September 11, 2017, N.J. Taxation filed a proof of claim, which was last amended on August 2, 2018, to assert priority claims in the amount of $73,418.73 and $2,707.57 and a general unsecured claim in the amount of $50,729.92. ("Claim 11-4"). Upon information and belief, N.J. Taxation's priority and unsecured claims set forth on Claim 11-4 will be allowed under the Plan.

8. On September 11, 2017, N.J. Taxation filed a proof of claim ("Claim 10" or "Taxation's Secured Claim") asserting secured claims totaling $602,883.32, with liens arising under New Jersey law (see N.J.S.A. 54:49-1) and perfected by the filing of various judgments against the Debtor, as follows:

    a. On or about August 10, 2006, N.J. Taxation docketed a judgment (DJ # 201633-06) against the Debtor for failure to pay personal gross income ("TGI-EE") taxes due for the 2003 tax year.

3

As of the Petition Date (as defined herein), $30,297.98 remained due under this judgment.  <u>See</u> Claim 10.

  b. On or about August 30, 2007, N.J. Taxation docketed a judgment (DJ # 237902-07) against the Debtor for failure to pay TGI-EE taxes due for the 2004 tax year.  As of the Petition Date (as defined herein), $85,629.47 remained due under this judgment.  <u>See</u> Claim 10.

  c. On or about January 15, 2009, N.J. Taxation docketed a judgment (DJ # 16236-09) against the Debtor for failure to pay TGI-EE taxes due for the 2006 tax year.  As of the Petition Date (as defined herein), $103,774.27 remained due under this judgment.  <u>See</u> Claim 10.

  d. On or about November 29, 2010, N.J. Taxation docketed a judgment (DJ # 303034-10) against the Debtor for failure to pay TGI-EE taxes due for the 2008 tax year.  As of the Petition Date (as defined herein), $131,900.14 remained due under this judgment.  <u>See</u> Claim 10.

  e. On or about May 10, 2012, N.J. Taxation docketed a judgment (DJ # 99386-12) against the Debtor for failure to pay TGI-EE taxes due for the 2005, 2007, 2009, and 2010 tax years.  As of the Petition Date (as defined herein), $251,281.46 remained due under this judgment.  <u>See</u> Claim 10.

 9. On or about November 17, 2017, the Debtor filed a motion (the "Motion") to modify Taxation's Secured Claim.  <u>See</u> Dkt. No.

54. In support of the Motion, the Debtor filed a certification in which he overstated the amount of the mortgages against the Debtor's real property and alleged a lack of equity securing N.J. Taxation's claims. See Dkt. No. 54-1. In actuality, there was nearly $275,000[1] in equity securing N.J. Taxation's claims.

10. By Order dated December 20, 2017, this Court modified "[t]he secured Proof of Claim No. 10 of the State of New Jersey in the sum of $602,883.32 . . . to a general unsecured claim." See Dkt No. 61.

11. A year later, the Debtor filed the Plan and related Disclosure Statement ("DS") on or about December 7, 2018. See Dkt. No. 111. In the DS, the Debtor represents that the Plan is "viable" because, among other things, "the real property is worth more than the three secured claims [i.e., the mortgages held by Bank of New York Mellon ("BNYM") and the claim asserted by the IRS]. . . ." DS, Section III.G.

12. On December 11, 2018, this Court entered a Revised Order Approving Disclosure Statement and Fixing Time for Filing Acceptances or Rejections of Plan, Combines with Notice Thereof. See Dkt. No. 116.

---

[1]  
    $4,900,000      Value of Property (Schedule A; DS)  
 - $3,136,294      1st Mortgage, Claim 14-1  
 - $1,490,684      2nd Mortgage, Claim 7-1  
    $  273,022      Equity

13. The Court has scheduled a hearing (the "Confirmation Hearing") on February 11, 2019 to consider confirmation of the Plan.

14. For substantially the reasons set forth herein, N.J. Taxation objects to confirmation of the Plan.

## LEGAL ARGUMENT

### POINT I

**Confirmation of the Plan Should be Denied Because the Plan Fails to Treat N.J. Taxation's Claim as Partially Secured and Fails to Meet the Requirements of 11 U.S.C. § 1129(a)(9)(D) for Secured Claims.**

15. Based upon a market analysis obtained from Bottone Realty Group, the Debtor values his residence located at 105 Middletown Road, Holmdel, New Jersey (the "Property") at $4,900,000. See DS at 31.[2] BNYM holds two mortgages on the Property in the amount of $3,136,294 and $1,490,684, respectively. See Claims 14 and 7; DS at 31.

16. The Debtor states that the third lien against the Property, in the amount of $10,900, is held by the IRS. See Plan, Art. II.D.1.

---

[2] For purposes of this written Objection, N.J. Taxation will accept the Debtor's representations with respect to the value of the Property. In the event of trial, N.J. Taxation reserves the right to dispute the valuation of the Property and the extent and validity of liens asserted against the Property.

6

17.  The IRS does not hold a third priority lien against the Property. Since N.J. Taxation recorded[3] liens against the Property in 2006, 2007, 2009, 2010 and 2012, well before the IRS recorded its lien on November 22, 2016, N.J. Taxation's liens are superior to the security interest of the IRS, and the Plan must treat them accordingly. Cf. Monica Fuel, Inc. v. Internal Rev. Serv., 56 F.3d 508 (3d Cir. 1995).

18.  Moreover, even if the IRS has a lien, there is still more than $260,000 in equity in the Property to secure N.J. Taxation's claims.

19.  The Order reclassifying Taxation's Secured Claim as general unsecured was based on the Debtor's erroneous representation that the first mortgage on the Property was $3,456,695.20 and that the sum of the mortgage liens was $4,947,380.10. Claiming that the Property is valued at $4,900,000, the Debtor asserted that there was no equity in the Property and thereby sought to reclassify N.J. Taxation's judgments as general unsecured claims.

20.  In reality, the first mortgage on the Property is only $3,136,294 (see Claim 14), and the sum of the mortgage liens is $4,626,979. Therefore, there is $273,022 in equity in the Property

---

[3] See paragraph 8 above.

after satisfaction of the mortgage liens. N.J. Taxation's claim is secured by that amount, and the Plan should so provide.

21. The Debtor cannot have it both ways. When making the Motion to reclassify N.J. Taxation's claim, the Debtor alleged a lack of equity securing N.J. Taxation's claim. But in the DS, when discussing "Risk Factors" that may prevent consummation of the Plan, the Debtor states that "the real property is worth more than the three secured claims, . . . ." If there is equity in the Property after satisfaction of the mortgages, N.J. Taxation was the first creditor to record its liens against the Property and, therefore, N.J. Taxation is entitled to payment of such equity to satisfy its secured Claim 10. See 11 U.S.C. § 506(a) (bifurcating creditor claims into secured and unsecured portions). Any equity remaining after satisfaction of the mortgages is not available for distribution to priority and unsecured creditors.

## POINT II

**The Court Should Deny Confirmation of the Plan Because the Plan Fails to Satisfy the Requirements of 11 U.S.C. § 1129(a)(9)(C) for Priority Claims.**

22. Section 1129(a)(9)(C) provides that, unless otherwise agreed, the holder of a priority tax claim under Section 507(a)(8), such as N.J. Taxation, must receive on account of such claim, regular installment payments in cash –

>   (i)    of a total value, as of the effective date of the plan, equal to the allowed amount of such claim;

>  (ii)    over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303; and
>
>  (iii)   in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b))

11 U.S.C. § 1129(a)(9)(C).

23. The Plan violates subsection (i) of the statute because the Plan does not provide for the payment of N.J. Taxation's priority tax claims at the appropriate rate of interest.  The Plan proposes payment of N.J. Taxation's priority tax claim at 4% interest.  However, Section 511 of the Bankruptcy Code requires that the Debtor pay interest at the applicable statutory rate for the payment of delinquent taxes.  11 U.S.C. § 511.  N.J.S.A. 54:49-3 provides that delinquent TGI-EE taxes accrue interest at the prime rate plus 3%.  Currently, the statutory interest rate as certified by N.J. Taxation is 8.25% per annum.

24. The Plan also violates subsection (ii) of the statute because it permits the Debtor to pay N.J. Taxation's priority tax claim "5 years following confirmation."  Plan, Art. II.C.2.  However, Section 1129(a)(9)(C)(ii) requires the Debtor to complete payment of N.J. Taxation's priority tax claim no later than 5 years after the date of the order for relief, or May 25, 2023.

25. Further, the Plan violates Section 1129(a)(9)(C)(iii), which requires priority creditors to be paid in a manner not less favorable than the most favored nonpriority unsecured creditors. The Debtor's Plan provides that general unsecured creditors will receive distribution upon the later of (i) closing on the sale of the Property or (ii) 3 years following the "effective date confirmation [sic]." Plan, Art. II.D.3. Thus, at the latest, unsecured creditors will be paid their full distribution by approximately April 2022. In order to be treated equally well, N.J. Taxation's priority tax claim also would have to be paid by April 2022, or else payments to the unsecured creditors will have to be postponed until after payment is made to N.J. Taxation on its priority tax claims.

### POINT III

**The Court Should Deny Confirmation of the Plan Because the Plan Fails to Comply with 11 U.S.C. § 1123(a)(3) as to General Unsecured Claims.**

26. Section 1123(a)(3) requires that a Chapter 11 plan "specify the treatment of any class of claims or interests that is impaired under the plan." 11 U.S.C. § 1123(a)(3).

27. The Plan cannot be confirmed because the Plan does not specify the treatment for general unsecured claims. Instead, the Plan and DS are each internally inconsistent in their provisions for payment of unsecured claims and they even potentially conflict with one another.

28. Article II.D.3 of the Plan provides that, if not paid from the proceeds of the sale of the Property, unsecured creditors will be paid a $50,000 lump sum "3 years following the effective date confirmation (sic)." However, Article II.F.4 provides that "Distributions to Class 5 [general unsecured] claimants will be made quarterly commencing on the seventh month following confirmation of the Plan."

29. The DS is similarly contradictory. In the proposed treatment chart on page 21, the DS provides that unsecured claims will be paid within 3 years of the 'effective date confirmation (sic),' but on page 30, the DS provides that payments to unsecured creditors will be made "5 years following confirmation."

### POINT IV

**The Plan is Unconfirmable Because it Violates the Absolute Priority Rule.**

30. The absolute priority rule, codified at 11 U.S.C. § 1129(b)(2)(B)(ii), provides that each class of unsecured creditors must be paid in full before the debtor can retain pre-petition property and earnings under a Chapter 11 plan. See Bank of America Nat'l Trust and Sav. Ass'n v. 203 North LaSalle P'ship, 526 U.S. 434, 441-42 (1999); In re Maharaj, 681 F.3d 558 (4th Cir. 2012)(absolute priority rule continues to apply to individual Chapter 11 cases post-BAPCPA).

11

31. The Plan violates the absolute priority rule because the Debtor will retain his ownership interest in the Property with his non-debtor spouse, yet unsecured creditors will not receive full payment on their claims. His interest in the Property will not be impaired, but unsecured creditors' claims will be severely impaired under the Plan. Such treatment violates Section 1129(b)(2)(B)(ii) of the Bankruptcy Code and, thus, cannot be confirmed.

### POINT V

**The Court Should Deny Confirmation of the Plan Because the Plan is Not Proposed in Good Faith and is Not Feasible.**

32. As a requirement for confirming a plan under Chapter 11, Section 1129(a)(3) of the Bankruptcy Code provides that a court must find that "the plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3); In re Nickels Midway Pier, LLC, 2010 Bankr. LEXIS 1642, *56-*57 (Bankr. D.N.J. May 21, 2010). "Good faith" is not defined by the Code "in the context of § 1129(a)(3)." In re Combustion Engineering, Inc., 391 F.3d 190, 246 (3d Cir. 2004). The Third Circuit has stated that "'[f]or purposes of determining good faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'" In re PWS Holding Corp., 228 F.3d 224, 242 (3d Cir. 2000), quoting In re

12

Abbotts Dairies of Pa., Inc., 788 F.2d 143, 150 n.5 (3d Cir. 1986)). "A good faith determination must be a fact-intensive, case-by-case inquiry." In re PPI Enterprises (U.S.), Inc., 324 F.3d 197, 211 (3d Cir. 2003).

33.  In this case, the Plan has a number of provisions, in addition to those described above, that demonstrate a lack of good faith by the Debtor in proposing the Plan. For example, there are over $8.4 million in general unsecured claims filed against the Debtor, including nearly $4.5 million in federal and state tax obligations the Debtor has flouted for nearly two decades, despite earning approximately $468,000 per year. Under the Plan, unsecured creditors will receive pro rata distribution of only $50,000. Under the Plan, unsecured creditors will receive, at most, approximately one-half of one percent distribution on account of their unsecured claims, in full satisfaction of their claims. Meanwhile, the Debtor's projections show that he will receive $41,254.20 per month, or $2,475,252 over the 5-year term of the Plan.

34.  In addition, the DS reveals that under the proposed Plan the distribution to be paid unsecured creditors will be reduced by any personal liability the Debtor is determined by the United States District Court for the Eastern District of New York to have in Campoverde v. Alex Figliolia Water & Sewer, LLC. DS, Art. II.E.2.

35. Debtors in Chapter 11 cases must pay a quarterly fee to the United States Trustee Program for each calendar quarter, or portion thereof, between the date of filing the petition and the date the court enters a final decree closing the case, dismisses the case or converts the case to another chapter in bankruptcy. 28 U.S.C. § 1930. United States Trustee quarterly fees constitute administrative expenses under Section 503(b)(1) of the Bankruptcy Code. 11 U.S.C. § 503(b)(1) (administrative claims include "actual, necessary costs and expenses" of Chapter 11); In re CSC Indus., 226 B.R. 402, 406-07 (Bankr. N.D. Ohio 1998); In re Maruko, Inc., 219 B.R. 567 (S.D. Cal. 1998) (quarterly fee payment is administrative expense); United States Trustee v. CF&I Fabricators of Utah (In re CF&I Fabricators of Utah), 214 B.R. 16 (D. Utah 1997) (quarterly fees are administrative expenses necessary to an open case).

36. The Plan improperly foists upon the unsecured creditors the obligation to pay post-confirmation United States Trustee quarterly fees out of their already meager $50,000 distribution. Plan, Art. II.F.4. It is the Debtor's obligation to pay all administrative expenses, including post-confirmation expenses, in full. See Maruko, 219 B.R. at 573 (reorganized debtor held responsible for quarterly fee payments for post-confirmation disbursements).

37. To make matters worse, the <u>Debtor</u> also intends to enrich himself by first dipping into the distributions to be made to all creditors except BNYM. The Plan provides that the Debtor will serve as his own disbursing agent under the Plan and he "shall receive 5% for distribution services rendered and expenses incurred pursuant to the Plan." Plan, Art. II.F.3. It is unclear from this provision how the dollar amount of the Debtor's proposed 5% disbursing agent's fee will be computed, nor does the Plan specify the funding source for payment of the disbursing agent's fee. If the Debtor deducts his fee from distributions to unsecured creditors, these creditors will be paid less than one-half of one percent of their claims, but not until the Debtor takes 5% for himself.

38. Individually and collectively, these provisions clearly indicate a lack of good faith, prohibiting confirmation under Section 1129(a)(3).

39. Moreover, the Plan is not feasible because Plan payments are contingent upon the Debtor's receipt of "consulting fees" from Alex Figliolia Water & Sewer, LLC. First, the DS contains insufficient information to determine feasibility because the DS includes only a partial cash flow analysis for weeks 49-60 after confirmation. Second, the Debtor's Master Plumber's License was revoked by the New York Department of Buildings in 2005 as a result of a felony conviction. It is unclear whether applicable law would

15

require the Debtor to have a license in good standing to perform his proposed "consulting" role.  Finally, the Debtor is 74 years old and has experienced health issues during the Chapter 11 case.  DS, Sections II.E.4 and III.G.  It is unlikely that the Debtor can or will consistently undertake gainful employment that will provide the additional income necessary to find the Plan feasible.

**POINT VI**

**The Plan Fails to Provide Default Remedies.**

40.  N.J. Taxation objects to the Plan's failure to include remedies in the event of the Debtor's default under the Plan.  Although Section 1123(a)(5)(G) of the Bankruptcy Code specifies that a Plan should provide default remedies for creditors, the Debtor's Plan fails to provide such remedies.  Lack of default remedies forces creditors, especially priority tax claimants, into an untenable situation if the Debtor defaults on Plan obligations.  Without proper default provisions under the Plan, priority tax claimants would be forced to pursue collection of Plan defaults in this Court.

41.  A post-confirmation default should be treated like any other contractual default under state law.  Instead of increasing the burden upon creditors, the Plan should grant creditors clear and concise default remedies in fora with concurrent jurisdiction.  Without Plan default remedies, the Plan deprives N.J. Taxation of the ability to pursue Plan defaults in non-bankruptcy fora.  N.J.

16

Taxation requests that the following language be included in any Confirmation Order:

> <u>Retained Jurisdiction and Enforcement Remedies for Tax Claimants</u>: Notwithstanding anything in this plan to the contrary, the Bankruptcy Court shall not retain jurisdiction with respect to tax claims except for (i) resolving the amount any tax claims arising prior to confirmation, and (ii) enforcing the discharge provisions of the confirmed plan. A failure by the reorganized debtor to make a payment to holders of tax claims pursuant to the terms of the plan shall be an event of default. If the reorganized debtor fails to cure an event of default as to Plan payments on the tax claims within thirty days after receipt of written notice of default from a tax claimant, then the tax claimant may (a) enforce the entire amount of its claim; (b) exercise any and all rights and remedies such tax claimant may have under applicable nonbankruptcy law; and/or (c) seek such relief as may be appropriate in this Court.

## **RESERVATION OF RIGHTS**

42. N.J. Taxation respectfully reserves its rights to (a) amend, supplement, or otherwise modify this Objection, (b) assert or raise such other and further objections or responses to the confirmation of the Plan based on additional information received from the Debtor or other sources, and (c) assert all rights and remedies under the Bankruptcy Code and applicable non-bankruptcy state and federal law against the Debtor and any non-debtor third parties.

## CONCLUSION

WHEREFORE, the N.J. Taxation respectfully requests that:

(1) confirmation of the Plan be denied;

(2) N.J. Taxation's liens in the Property receive their proper priority and treatment under a revised Chapter 11 plan; and

(3) the Court grant such other and further relief as it deems just and appropriate under the facts and circumstances of this case.

> Respectfully submitted,
>
> GURBIR S. GREWAL
> Attorney General of New Jersey
>
> By: /s/ Valerie A. Hamilton
> Valerie A. Hamilton
> Deputy Attorney General

Dated:  February 4, 2019